**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LINDA MENNUCCI,**

    **Plaintiff,**       **Case No. 2:09-cv-900**
                 **JUDGE GREGORY L. FROST**
  **v.**            **Magistrate Judge Mark R. Abel**

**HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,**

    **Defendant.**

**<u>OPINION AND ORDER</u>**

In this ERISA action, Plaintiff, Linda Mennucci, appeals from the denial of her

application for long-term disability benefits under a plan administered by Defendant, Hartford

Life and Accident Insurance Company ("Hartford").  The parties have filed cross-motions for

judgment on the administrative record (Docs. # 20, 21), as well as memoranda in opposition

(Docs. # 22, 23).  For the reasons that follow, the Court **DENIES** Hartford's motion (Doc. # 21)

and **GRANTS** Mennucci's motion (Doc. # 20).

**I.  Background**

Plaintiff, Linda Mennucci, worked for JPMorganChase as a loan officer, a job that

consisted of sitting at a desk and working on a computer.  In May 2007, Mennucci underwent

spinal fusion surgery for cervical neck pain that radiated into her right arm.  Following the

surgery, she was off work for approximately three months until returning to work in August

2007.  Because Mennucci reported that she continued to have pain, as well as problems with her

right arm and hand, she engaged in physical therapy and regularly took two prescriptions drugs,

Elavil and Skelexa, and an over-the-counter pain medication.

In April 2008, Mennucci saw Physical Medicine and Rehabilitation Specialist Steven T. Woods, M.D., in connection with complaints of ongoing neck pain that radiated into her right shoulder.  Woods did not uncover any nerve damage in Mennucci and treated her with facet joint injections that relieved approximately half of her pain.  The following month, Mennucci returned to her surgeon, Gregory Z. Mavian, D.O., F.A.C.O.S., who found no issues with the spinal fusion.  Mavian recommended additional injections to relieve the pain Mennucci reported that she was experiencing.  Mennucci then began a series of cervical medial branch blocks in July and August 2008 under Woods' care.  Although still reportedly in pain, Mennucci had full range of motion.  During this period of treatment, Mennucci received short-term disability benefits that eventually "rolled over" into long-term disability benefits.

Hartford is the insurer that issues and administers the JPMorganChase long-term disability benefits plan that covers Mennucci.  The group benefit plan provides:

> **Disability or Disabled** means:
> 1.     during the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation;
> 2.     following the Elimination period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre-disability Earnings.

(Doc. # 19-1, at 29.)  The plan defines the Elimination Period as the period of time during which an insured muse be disabled before benefits become payable, which is "the first 182 consecutive day(s) of any on period of Disability."  (Doc. # 19-1, at 15.)  The plan also defines an Essential Duty" as "a duty that . . . is substantial, not incidental," "is fundamental or inherent to the occupation," and "can not be reasonably omitted or changed."  (Doc. # 19-1, at 30.)  The plan states that "[t]o be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty."  (*Id.*)  To obtain benefits in the event of disability, an insured must submit

timely proof of loss documenting the disability and other information.  (Doc. # 19-1, at 25.)  The

plan entitles Hartford at its election to reasonably require an insured to submit to an interview

with a Hartford representative and to submit to an examination by a doctor or other medical or

vocational professional.  (Doc. # 19-1, at 26.)  Hartford has full discretion and authority under

the plan to determine an insured's eligibility for benefits.  (Doc. # 19-1, at 42.)

Hartford initially approved Mennucci's claim for long-term disability benefits in October

2008.  In response to a subsequent inquiry by Hartford, Woods explained on the first page of a

December 23, 2008 Attending Physician's Statement that Mennucci had the primary diagnoses

of degenerative disc disease and facet arthropathy with a secondary diagnosis of myofascial pain.

He noted her complaints of a stabbing or burning pain at the base of her neck with intermittent

pain down her arms.  Woods also noted that Mennucci's cervical spine range of motion was

limited and painful and that she had diffuse tenderness throughout her neck and shoulders.  He

indicated that the treatment plan was to continue trigger point injections and physical therapy.

The second page of the Attending Physician's Statement purported to set forth

Mennucci's functional capabilities.  (Doc. # 19-3, at 82.)  Woods checked off responses

indicating that Mennucci had no restrictions on driving, that she could frequently reach above

her shoulder level and could occasionally reach at waist or desk level, and that she could sit for

one hour at a time for a period of four hours per day in a general workplace environment.

Hartford construed the restrictions as permitting Mennucci to return to work and sought

additional information related to this conclusion.  On April 17, 2009, Hartford Clinical Case

Manager Barbara Phelps requested such additional information from Woods.  Referencing the

December 23, 2008 Attending Physician's Statement, Phelps stated that Woods "had given no

restrictions on driving which indicates ability to sit as needed with no limitations and ability to reach at desk level." (Doc. # 19-2, at 12.) She then asked Woods two questions: "Do you feel the patient could sit up to 6 hrs a day (you said 1 hr at a time up to 4 hours a day)?" and "Could the patient reach at desk level frequently (you said the patient could reach frequently above the shoulder)?" (*Id.*)

Responding on April 30, 2009, Woods circled the "No" answer in response to the first question and circled the "No" answer in response to the second question, adding a handwritten notation "only occasionally" to his second question answer. (Doc. # 19-3, at 19.) Below a section that asked him to explain his rationale if he answered no to either question, Woods made a handwritten notation "see dictated note 4-30-09." (*Id.*) The dictated note, memorialized as an April 30, 2009 letter from Woods and Nicholas Stanwick, Woods' physician's assistant, provides:

> Question one inquires, "do you feel that the patient can sit up to six hours a day?" Due to the patient's medical disabilities, at this point, we do not feel that she could tolerate sitting for up to six hours a day. Her previous job had required basically the same type of job skills and she was unable to tolerate that, even after transitioning to standing position each hour for a break.
>
> Question two asked, "could the patient reach at desk level frequently? (you said the patient could reach frequently above the shoulder)" Upon reviewing the functional capability section of the paperwork, we had erroneously marked that she could frequently reach above her head with both arms. I am sorry for any confusion that may have caused.

(Doc. # 19-3, at 21.) Woods electronically signed the letter. (*Id.* at 22.)

On May 5, 2009, Hartford sent Mennucci's file for review by Dr. Richard Kaplan. Apparently several hours later on the same day the file went to Kaplan, Hartford received Woods' response. In a May 8, 2009 file notation, Hartford indicated that it had "[r]eceived reply

4

from Dr Wood dated 4/30/2009 saying the clmt could not sit up to 6 hours and could not reach frequently at desk level."  (Doc. # 19-1, at 63.)  The docket notations indicate that the reply was "[s]ent to [Kaplan's employer] to include in peer review; faxed info and received fax confirmation."  (*Id.*)  Hartford disputes that it received the dictated supplemental letter in May 2009 and argues that it did not receive the additional material until after Kaplan's file review had concluded.

Kaplan determined that Mennucci could return to work.  In his May 12, 2009 report, Kaplan summarizes portions of the December 23, 2008 Attending Physician's Statement and then states that "[o]n 04/15/09, Dr. Woods responded to a letter in which he indicated he did not feel the claimant could sit up to 6 hours per day and he did not feel the claimant could reach at desk level frequently."  (Doc. # 19-3, at 33.)  This reference to an April 15, 2009 response by Woods injects a lack of clarity into the facts.  Woods responded on April 30, 2009, to questions Phelps posed in an April 17, 2009 letter, but there is no April 15, 2009 response by Woods.  It appears that Kaplan reviewed the notations Woods had made on Phelps' letter and that Kaplan simply misstated the date.  In any event, Kaplan did not address in his report Woods' April 30, 2009 dictated corrections to the earlier Attending Physician's Statement.  As noted, the record does not reflect that Kaplan had actually reviewed the dictated letter, despite the notation that a letter from Woods had been faxed to his employer and that Hartford had received confirmation of the transmission.

The record also reflects that Hartford was unclear concerning Woods' dictated April 30, 2009 corrections.  After receiving Kaplan's report, Phelps sent Woods a summary of its content and invited an apparently always unavailable Woods to respond.  Woods's apparent response

5

was to re-send his April 30, 2009 letter.  Phelps subsequently made the following June 29, 2009

notation in the file docket:

> Received a letter sent by MCM 4/17/09 with response requested 4/23/09 to Dr
> Woods.  This was prior to peer review.  Letter is dated 4/30/09 but apparently faxed
> 6/24/09.  MD answered no to sit 6 hrs a da y [*sic*] and no to reach frequently at desk
> level – only occ.
>
> Letter is attached dated 4/30/09: apparenlty [*sic*] done with DR Woods and PA
> explaining the answers in MCM letter.  A peer review was done 5/12/09 after this
> information was done but not received.  This information does not change the MD
> did not respond to letter- on the peer review.

(Doc. # 19-1, at 59.)  A next day docket notation indicates that Hartford was terminating

Mennucci's benefits because "she no longer met the def[inition] of disability."  (Doc. # 19-1, at

58.)  Hartford informed Mennucci of its decision in a June 30, 2009 letter that provides in

relevant part:

> In an effort to clarify whether the medical records received substantiated the
> restrictions and limitations provided by your physician, your file was referred to The
> Hartford's Medical Case Manager for review.  The Medical Case Manager reviewed
> your file and remained unclear as to the severity of your condition.  Therefore, to
> give your claim further consideration, your file was then referred for an Independent
> Records Review.
>
> Your file was reviewed by Dr. Richard Kaplan on 5/12/2009.  Dr. Kaplan attempted
> to further clarify your restrictions and limitations with Dr. Woods on 5/7/2009,
> 5/8/2009 and 5/11/2009 by telephone.  Dr. Woods did not respond to Dr. Kaplan's
> requests.
>
> Dr. Kaplan reviewed your file and noted that although you are status post a C3-C6
> anterior cervical discectomy and fusion with reported residual pain, there are no
> clinically significant neurological deficits noted.  Overall, Dr. Kaplan determined
> that you are capable of occasional cervical range of motion as well as no overhead
> lifting and you can lift up to 10lbs frequently or 20lbs occasionally.  He also feels
> that you should avoid climbing of [*sic*] working at heights.  Dr. Kaplan has advised
> that these restrictions are permanent in nature.
>
> The Medical Case Manager completed the review of your file on 6/18/2009 and
> agreed with the Independent Record Review findings.  The Medical Case Manager

also determined that you are able to perform job tasks on a full time basis with the restrictions provided in the Independent Record Review.

We compared this information to the essential Duties of Your Occupation as a Loan Officer.  Based on this information, we have concluded that you are able to perform these duties as of 7/1/2009.

(Doc. # 19-2, at 6.)  The letter also informed Mennucci of her right to appeal the termination of benefits.

Mennucci exercised her right to appeal.  As part of her appeal, she submitted a letter in which she noted that the occupational analysis on which Hartford purported to rely failed to address what she actually did in her occupation and instead addressed activities not involved in her job as a loan officer (*e.g.*, carrying, pushing, and pulling 10 lbs).  She also supplied Hartford with another copy of Woods' April 30, 2009 clarifications.  Hartford acknowledged the receipt of the Woods letter and its corrective content in a file docket notation and sent the file to orthopedic surgeon Kenneth Kopacz for another peer review.

In a September 15, 2009 report, Kopacz indicated that Mennucci "is able to function in an 8 hour day/40 hours per week with restrictions on overhead activities, and no lifting overhead/no repetitive overhead activities, due to the pain with cervical motion."  (Doc. # 19-2, at 36.)  He characterized Mennucci's reports of pain as "subjective" and concluded that "she is restricted from overhead activities requiring neck extension, but is otherwise able to function 40 hours per week."  (Doc. # 19-2, at 36.)  The parties dispute whether Kopacz reviewed all relevant documents in reaching these conclusions, but it is impossible to ascertain from his report what documents he actually reviewed.  The report only references various documents in a list of "[i]nformation reviewed" that "includes, but is not limited to" the specific identified documents.  Hartford denied Mennucci's appeal in a September 22, 2009 letter that summarized

the company's position that the medical documentation does not support a functional impairment that would preclude Mennucci from performing as a loan officer.

Having exhausted her administrative remedies, Mennucci filed the instant action on October 13, 2009.  Mennucci asserts a single claim under the Employee Retirement Income Security Act of 1974 ("ERISA") for benefits under 29 U.S.C. § 1132(a)(1)(B).  (Doc. # 2.)  The parties have completed briefing on cross-motions for judgment on the administrative record, and the case is ripe for disposition.  (Docs. # 20, 21.)

## II.  Analysis

### A.  Standard Involved

The statute under which Mennucci proceeds, 29 U.S.C. § 1132(a)(1)(B), "gives a participant the right to bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.' " *Creech v. Unum Life Ins. Co. of N. Am.*, 162 F. App'x 445, 448 (6th Cir. 2006).  It is well settled that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 505-06 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  *See also Calvert v. Firstar Finance. Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005).  If the plan provides the administrator with discretion, then "the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998).  *See also Calvert*, 409 F.3d at 291-92.

8

Both sides agree that the arbitrary and capricious standard applies in the instant case. (Doc. # 20, at 11; Doc. # 21, at 14.)  The Sixth Circuit has explained that, in determining whether this standard applies, a court should remain cognizant that a plan is not required to use certain magic words to create discretionary authority for a plan administrator in administering the plan. *Johnson v. Eaton Corp*., 970 F.2d 1569, 1572 at n.2 (6th Cir. 1992).  What is required is "a clear grant of discretion [to the administrator]." *Wulf v. Quantum Chem. Corp*., 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994).  Because the plan provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy," (Doc. # 19-1, at 45), the Court agrees with the parties that the arbitrary and capricious standard applies.

This standard "does not require [the Court] merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  Rather, under the arbitrary and capricious standard, a plan administrator's decision will not be deemed arbitrary and capricious so long as "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (noting that "the arbitrary and capricious standard is the least demanding form of judicial review").  A court must therefore "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Jones*, 385 F.3d at 661.  In other words, the Court will uphold a benefit determination if it is "rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).  *See also Calvert*, 409 F.3d at 292.

In evaluating the record, then, the Court is required to consider only the facts known to

the plan administrator at the time the final decision was made to deny disability benefits.  *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005); *see also Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).  The Court is also required to remain cognizant of the potential inherent conflict of interest that arises when a party such as that Hartford acts as both the decision maker on a claim and the potential payor of that claim.  *Calvert*, 409 F.3d at 292.  With these concerns in mind, the Court shall turn to the merits.

**B.  Discussion**

Mennucci argues that she is entitled to benefits because she is disabled within the meaning of the plan and because, in reaching the contrary conclusion, Hartford ignored relevant evidence.  The crux of her argument is simple: Hartford has failed to point to any evidence in denying her benefits that contradicts Woods' findings leading to his conclusion that she cannot perform as a loan officer.

The Court will address the issues of whether Hartford considered or had its peer review doctors consider all relevant material.  As noted above, there is disagreement as to whether and when Woods' dictated April 30, 2009 letter made its way to those who needed to consider it.  The record is not adequately helpful in conclusively resolving this issue.  Portions of the record suggest that Kaplan did not have the benefit of this letter.  It also appears that upon the letter's re-submission to Hartford, the company curiously regarded the letter as new content.  Finally, it appears that Kopacz might have had the letter before him, but his vague reference to an April 30, 2009 note (which could have been the handwritten comment on Hartford's April 17, 2009 letter to Woods) and the wholly unhelpful included-but-not-limited-to language employed in Kopacz's summary of what material he reviewed inject only continuing uncertainty, not clarity, into

whether Hartford through dubious incompetence or cherry-picking ultimately relied on reports that grew out of an incomplete record.

It is not this Court's role to search for and assemble inferences that aid Hartford's treatment of Mennucci's evidence. *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 672 (6th Cir. 2006) ("As for the district court's attempt to reconcile the conflicts in the record, we point out that the court's role is to review the basis for the decision that was actually made by the plan administrator, not to provide an adequate basis where none was offered."). Because this Court cannot say that Hartford's reviewing physicians reviewed all of the documents Mennucci submitted or others had submitted on her behalf, the Court cannot conclude that these physicians provided a fair assessment of the medical evidence so that Hartford could properly rely on the reviewing physicians' opinions. *See Bell v. Ameritech Sickness & Accident Disability Benefit Plan*, Nos. 09-1562 & 09-1565, 2010 WL 4244126, at *5 (6th Cir. Oct. 15, 2010) (noting that an insurer could rely on a reviewing physician's opinion only when the physician has engaged in a full review of the claimant's submitted documents and provided a fair assessment of their contents). This is problematic in light of the Sixth Circuit's clear directive that a "plan administrator must provide [persons conducting a file review] with all letters from a claimant's physician, which the file reviewer must consider." *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009). *See also Glenn*, 461 F.3d at 671.

Problems exist even aside from the issues of what Hartford effectively provided, when they provided it, and what the file reviewers actually considered. The Sixth Circuit has explained that "the ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying

benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). This holding is notable because, similar to the facts in *Spangler*, the facts here indicate that not only was the record upon which Hartford's doctors relied flawed, but "virtually all of the evidence in the administrative record shows that [Mennucci] is disabled from working." *Id.* The Court reaches this conclusion based on the opinions of Woods and Hartford's handling of those opinions.

Hartford is of course not required simply to credit Woods' opinions. But Hartford cannot ignore or disagree with those opinions without cause to do so. The Sixth Circuit has explained that "a lack of evidence of improvement" coupled with "a lack of explanation or support for the plan's decision" can demonstrate an arbitrary and capricious decision. *Morris v. Am. Elec. Power Long-Term Disability Plan*, No. 08-4412, 2010 WL 4244120, at *5 (6th Cir. Oct. 15, 2010). The court of appeals has also cautioned that new evidence is not necessarily required; additional detail and analysis may suffice to support a decision to end benefits. *Id.* at *6. Most notably for present purposes, however, is the Sixth Circuit's reasoning regarding the weight to be afforded the opinions of a treating physician such as Woods:

> Generally speaking, a plan may not summarily reject the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion. [*Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006)]. Giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious. *Ibid.* Plan administrators, however, "are not obligated to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). To that extent, a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion. *See, e.g., Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 473 (6th Cir. 2005) (administrator's decision not to credit treating physicians' assessments not arbitrary because the assessments were not supported by the objective evidence, as required by the plan document).

12

*Morris*, 2010 WL 4244120, at *8.  This reasoning is informative because Hartford, unlike the insurer in *Morris*, did not set forth in its communications that a lack of objective data as the primary reason for choosing not to credit the treating physician's relevant opinions.  *See id.* Rather, Hartford's June 30, 2009 letter terminating Mennucci's benefits presented primarily disagreement with and not an explanation for rejecting several of Woods' opinions.

Mere reliance on a file review, standing alone, does not require a finding of arbitrary and capricious conduct.  *Morris*, 2010 WL 4244120, at *11 (citing *Kalish*, 419 F.3d at 509).  It is the overall assessment that matters, and Hartford has failed to offer a sufficiently reasoned explanation, based on evidence, for its decision to terminate Mennucci's benefits.  It is unclear whether some or all of the doctors whose reports Hartford relied upon even had before them all of the relevant data, despite repeated submissions of that information to Hartford and despite some Hartford actors apparently attempting to submit that data.  It is also unclear what evidence, if any, supports Hartford's rejection of Woods' opinions as to issues that target the actual work functions that comprise a loan officer's job.  Hartford's rejection of findings supporting Mennucci's continuing disability thus lack an evidentiary basis that supports the company's rejection of her treating physician's evaluation.  *See Glenn*, 461 F.3d at 671 ("[T]he plan administrator need not accord special deference to the opinion of a treating physician.  By the same token, it may not arbitrarily repudiate or refuse to consider the opinions of a treating physician"); *Kalish*, 419 F.3d at 509-10 (finding arbitrary and capricious conduct under facts presenting a "pure paper" file review that ignored a treating physician's opinions).

Hartford argues that it is entitled to reject Woods' opinions because the opinions on which Mennucci relies are actually the opinions of physician assistant Stanwick.  Two

considerations undercut the weight of this argument. First, Woods' opinion relied upon and thus must be said to have adopted the findings and conclusions of Stanwick; the April 30, 2009 letter, which Woods electronically signed, even speaks in the plural and presents a joint endeavor in which Woods and Stanwick reached the same conclusions. Second, there is no basis in the record for concluding that Hartford or its reviewing physicians questioned the relative qualifications of those treating Mennucci to the extent the company does now when Hartford made its termination decision. This appears to be an after-the-fact justification proffered for litigation, much like a red-herring "conflict" in medical opinions between Woods and Mavian suggested by Hartford. *Cf. Bloom v. Hartford Life & Accident Ins. Co.*, No. 3:05CV-518-H, 2007 WL 2000082, at *5 (W.D. Ky. July 2, 2007) ("Hartford cannot now make *post hoc* justifications for its decision, when it had ample opportunity to explain the grounds for its decision in its initial denial and subsequent appeal. Under the arbitrary and capricious standard, the Court must examine Hartford's proffered explanations during the administrative process–not those provided by its attorneys during proceedings in this Court."). The end result is that whether by joint formation or by adoption, Woods offered opinions that Hartford did not adequately address–for example, how Mennucci can perform her desk job day in and day out when she cannot sit at a desk for most of the day.

Nor do Hartford's documents indicate evidentiary support for the implicit rejection of Mennucci's statements regarding her own pain and capabilities. The Sixth Circuit has explained that in rejecting such claims based on their subjective nature, "where an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Helfman*, 573 F.3d

14

at 395-96.  Any "determinations of credibility made without having met or examined [a] claimant and contrary to [the] findings of [a] treating physician supports finding that [the] denial of benefits was arbitrary and capricious."  *Id.* at 396 (describing holding of *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296-97 (6th Cir. 2005)).  These holdings compel this Court to disagree with Hartford's rejection of the obvious.  Hartford argues that "although Drs. Kaplan and Kopacz noted that [Mennucci] had subjective complaints of pain, they did not make a credibility determination with respect to those complaints."  (Doc. # 23, at 10.)  This is simply not true.  By reaching the conclusions they did, these reviewing physicians implicitly rejected Mennucci's assessments of her pain and capabilities, just as the conclusions of Woods and Stanwick implicitly credited Mennucci's assessments.  To conclude otherwise would be to ignore the reality of the decisionmaking involved in favor of a "magic words required" approach that defies logic and common sense.

Electing to conduct a file review only, Hartford rejected Mennucci's claims and several of Woods' key opinions without a substantial-evidence-derived basis for doing so and focused on issues that at times appear to be largely irrelevant to Mennucci's occupation, while apparently also failing to ensure that one or more reviewing physicians possessed and considered all the evidence.  This is arbitrary and capricious conduct.  *See Glenn*, 461 F.3d at 671.

### III.  Conclusion

For the foregoing reasons, the Court **DENIES** Hartford's motion (Doc. # 21) and **GRANTS** Mennucci's motion (Doc. # 20).  This Court therefore **ORDERS** that Hartford is required to pay benefits (in a lump sum) plus interest from the date on which Mennucci's benefit payments ceased, as well as reinstated benefits until Mennucci is no longer disabled under the

plan.  *See Glenn*, 461 F.3d at 675 n.5.  Additionally, Mennucci shall file within thirty days of the filing of this Opinion and Order a properly supported motion for attorney's fees and costs, and the parties shall proceed to brief the motion in accordance with S. D. Ohio Civ. R. 7.2(a)(2).  *See* 29 U.S.C. § 1132(g)(1).  The Court will then determine whether Mennucci is entitled to attorney's fees and costs.

The Clerk is instructed to enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

                         /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

16